IN THE DISTRICT COURT OF THE UNITED STATES
FOR THE MIDDLE DISTRICT OF ALABAMA
EASTERN DIVISION

| | |
|---|---|
| JERRY WHITE, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | CIVIL ACTION NO. 3:08CV401-SRW |
| ) | (WO) |
| RUSSELL CORPORATION, ) | |
| ) | |
| Defendant. ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiff Jerry White brings this action against defendant Russell Corporation, alleging that defendant discriminated against him on the basis of his race, in violation of Title VII and 42 U.S.C. § 1981, and his age, in violation of the Age Discrimination in Employment Act (ADEA), when it disciplined him and – as a result of the disciplinary action – terminated his employment.[1]  This action is presently before the court on defendant's motion for summary judgment (Doc. # 16).  Upon consideration of the motion, the court concludes that it is due to be granted.

**BACKGROUND**[2]

Defendant Russell manufactures athletic apparel and equipment.  Plaintiff Jerry White

---

[1] White is African-American and is now sixty-one years of age. (Complaint and Answer at ¶ 6; White depo., p. 121).

[2] As it is required to do, the court has viewed the evidence presented on the motion for summary judgment in the light most favorable to the plaintiff.  Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992).  The court considers any objections not made to the use or admissibility of the evidence waived for purposes of this motion.  Davis v. Howard, 561 F.2d 565, 570 (5th Cir. 1977).

worked at Russell's "Cotton Warehouse," operating a Swing Reach Truck (also known as a "turret truck"). The Cotton Warehouse is a large open building which contains tall rows of racks holding pallets of merchandise. The warehouse is divided into two sections by a wide center aisle; each section has rows of racks separated by narrow aisles. The racks consist of vertical steel beams, each supporting over 6,000 pounds of weight, with horizontal steel shelves bolted to the vertical beams. Steel grating lines the bottoms of the shelves, and pallets of goods are stored on the grating. (Kretschmann aff., ¶¶ 2-4).

A turret truck is a very large piece of equipment used to move pallets of finished goods. Russell began using turret trucks at the Cotton Warehouse in February 2007. (White depo., pp. 10-11, 18). Russell installed an electronic guide system in the floor that steers the turret truck while it is in the narrow aisles. Sensors on the turret truck are electronically linked to guide wires in the floor of the warehouse. When a turret truck operator has successfully aligned a turret truck on the guide wires, the truck produces an audible signal and a visible notification on the truck's control display. Once the truck is aligned properly, the truck is steered automatically down the aisle.

Plaintiff and other turret truck operators received training from the turret truck manufacturer in February 2007, which included practice in driving the turret trucks and aligning them on a guide wire. Drivers are taught that, when backing, they are either to stand up to look behind them or to swivel in the operator's seat so that they can see the aisle behind them. To align a truck on a wire to back into an aisle, an operator drives the turret truck forward into the aisle across the center aisle, then slowly backs the truck toward the desired

aisle. When the truck is close to being aligned, it begins chirping to indicate that the sensors are trying to align with the wire. When the turret truck is aligned on the wire, it emits an audible tone. In addition, an hour-glass symbol on the front monitor and a set of lights in the rear glass illuminate. When the driver hears the tone indicating that the truck is aligned on the wire, the driver flips a switch, the tone stops and the truck is automatically guided down the aisle. (Kretschmann aff., ¶¶ 5-8).

On April 19, 2007, plaintiff was operating the turret truck. He looked down an aisle between a row of shelves and saw that no one was in the aisle. He aligned the turret truck on the wire and backed into the alley. He did not look back again. While plaintiff was backing, another employee, Lakeisha Smith, entered the aisle on another piece of equipment to perform inventory. Although she was supposed to blow a horn to alert others that she was in the aisle, she did not do so. Smith was talking on her telephone at the time. If Smith had been performing her job, plaintiff would have heard her machine "beep," but he never heard anything. Plaintiff did not see Smith, and he struck her with the turret truck. (White depo., pp. 12-21). Smith fell, bumped her head, and landed on her knees. (Kretschmann aff., ¶ 12). Plaintiff testified that he and Smith were equally responsible for the accident. He stated that he should have looked back again to make sure no one was in the aisle, and Smith should have let him know that she had come into the aisle behind him. (White depo., pp. 13-14). Plaintiff did not tell anyone at the time that Smith had been on her telephone, because he did not want her to be fired. (White depo., pp. 16-17).

Russell has a progressive discipline policy that includes a documented verbal warning

3

(Step 1), two documented written warnings (Steps 2 and 3), and discharge after suspension during investigation (Step 4).  (Exhibit A to Kretschmann aff.).  The policy provides that minor offenses count as one step and remain effective for three months.  Major offenses count as two steps and remain effective for six months.  If an employee receives a second major offense reprimand within six months of a previous major offense reprimand, the employee will be terminated.  One of the listed major offenses is "Violation of safety practices which could cause injury to self or others or cause serious property damage."  On April 23, 2007, plaintiff received a major offense reprimand for the April 19 accident. (Kretschmann aff., ¶ 15 and Exhibit A; Exhibit 2 to White depo.).  The policy provides that "the corrective action steps . . . are guidelines, not automatic rules, and depending upon the seriousness of the violation, the employee's individual work record, employment history, and any other factor meriting attention at the particular time, the Company reserves the right to apply more or less severe levels of corrective action."  (Exhibit A to Kretschmann aff.).

After plaintiff's April 19 accident, Russell added side mirrors to the turret trucks and instituted a rule that two employees should not be in the same aisle at the same time.  "Cycle counters" like Smith were required to place chains across the ends of the aisles when they were working in an aisle.  The turret truck operated by plaintiff at the time of the accident did not have a mirror.  Plaintiff testified that a rearview mirror would have prevented the accident. (White depo., pp. 78-81).  The turret truck "rules and procedures," however, provide that: (1) "*Backing* in alleys is *strictly prohibited* unless you have excellent visibility looking over your shoulder or standing up facing the direction of travel[,]" and that *"[i]f [the*

4

*truck is] equipped with a rearview mirror the mirror is not to be used as visibility for backing the truck it is to be used as a safety aid just like it is used in your automobile.*" (Exhibit 5 to White depo., ¶¶ 14, 15)(emphasis in original).

On July 11, 2007, plaintiff was attempting to align his turret truck on the guide wire to back into an aisle. He testified that the truck's "computer showed that it was trying to get on [the wire]. It was beeping a little bit. It was trying to get on the line. But it wasn't quite on the line." (White depo., pp. 50-51). Plaintiff was looking back as he slowly backed the turret truck toward the aisle. The truck "beeps" when it is close to being on the line and stops when the truck is aligned. Plaintiff's truck was beeping, and he was backing, "thinking [he] was close to being on the line. (Id., p. 68). Plaintiff knew he was not on the line, but thought he was close. He did not realize he was "that close to that rack, and [he] bumped the rack." (Id.).[3] He hit the rack on the end of the aisle, bending the rack. (Id., pp. 53-55). Eddie Tolbert, a lead person, approached plaintiff when he saw plaintiff standing in the aisle looking at the rack. Plaintiff told him that he had hit the rack, and Tolbert called Robert Horton, the supervisor. (Id., pp. 60-64). Horton came to the scene of the accident. He sent plaintiff for a drug test, which came back negative. (Id., p. 70). The next day, plaintiff was not allowed to operate the truck and asked to work in a different department. That same day, plaintiff was called to the office to meet with Horton and George Kretschmann (the Department Manager of Warehousing). Kretschmann told plaintiff that he was receiving a

---

[3] Plaintiff testified earlier in his deposition that "I thought I was on the line, but I wasn't." (White depo., p. 55). However, he later clarified that he thought he was "close" to being on the line. (Id., p. 65).

major reprimand for the accident and, since the reprimand placed him on Step 4 under the disciplinary policy, Kretschmann was suspending plaintiff subject to a final termination decision by a review board. (White depo., p. 70; Kretschmann aff., ¶¶ 1, 14).

The review board – which was comprised of a Human Resources Manager from another Russell facility and two Department Managers from the Alexander City Distribution Center – convened on July 17, 2007. Kretschmann first presented the company's case outside of plaintiff's presence. Plaintiff then met alone with the board members. Plaintiff explained the accidents to the members, and told them that Smith had been on the telephone at the time of the first accident. (White depo., pp. 75-77; Kretschmann aff., ¶ 16). After the hearing, the review board affirmed management's decision to terminate plaintiff's employment. (Exhibit 11 to White depo.; Kretschmann aff., ¶ 16).

## THE SUMMARY JUDGMENT STANDARD

A party seeking summary judgment bears the initial burden of demonstrating to the court the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions that it believes show an absence of any genuine issue of material fact. Hairston v. Gainesville Publishing Co., 9 F.3d 913 (11th Cir. 1993). In Celotex Corp. v. Catrett, 477 U.S. 317 (1986), the Court held that if a party opposing summary judgment "fails to make a showing sufficient to establish the existence of an element essential to their party's case, and on which their party will bear the burden of proof at trial," summary judgment shall be granted.

[W]here the nonmoving party will bear the burden of proof at trial on a

>dispositive issue . . . Rule 56(e) . . . requires the nonmoving party to go beyond the pleadings and by . . . affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial. . . We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment. . . . Rule 56(e) permits a proper summary judgment motion to be opposed by any of the kinds of evidentiary materials listed in Rule 56 except the mere pleadings themselves. . . ."

Id. at 324.

For summary judgment purposes, an issue of fact is "material" if it is a legal element of the claim, as identified by the substantive law governing the case, such that its presence or absence might affect the outcome of the suit. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). An issue of fact is "genuine" if the record taken as a whole could lead a rational trier of fact to find for the nonmoving party. Matsushita Electrical Industrial Company v. Zenith Radio Corp., 475 U.S. 574, 587 (1986). The court must view the evidence, and all factual inferences properly drawn from the evidence, in the light most favorable to the nonmoving party. Welch v. Celotex Corp., 951 F.2d 1235, 1237 (11th Cir. 1992); Rollins v. TechSouth, Inc., 833 F.2d 1525, 1528 (11th Cir. 1987). It is improper for this court to weigh conflicting evidence or make credibility determinations; instead, "the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson, 477 U.S. at 255. Where a reasonable fact finder may "draw more than one inference from the facts, and that inference creates a genuine issue of material fact, then the court should refuse to grant summary judgment." Barfield v. Brierton, 883 F.2d 923, 933-34 (11th Cir. 1989) (citation omitted).

**DISCUSSION**

Under Title VII and Section 1981, it is unlawful for an employer to discriminate against an employee on the basis of his race with respect to termination or other terms and conditions of employment. 42 U.S.C. §§ 1981, 2000e-2. The Age Discrimination in Employment Act ("ADEA") prohibits such discrimination on the basis of age. 29 U.S.C. § 623(a)(1). Plaintiff claims that defendant discriminated against him by subjecting him to more severe discipline than other similarly situated employees and, as a result, terminating his employment on the basis of both his race and his age.

Analytical Framework

The McDonnell Douglas/Burdine[4] framework was established by the Supreme Court for evaluating a Title VII plaintiff's claims of discrimination against an employer where, as here, there is no direct evidence of discrimination. See Combs v. Plantation Patterns, 106 F.3d 1519, 1527-28 (11th Cir. 1997). This analytical framework is also applicable to race discrimination claims asserted pursuant to 42 U.S.C. § 1981 and to claims of discrimination under the ADEA. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir.1998)(§ 1981); Cofield v. Goldkist, Inc., 267 F.3d 1264, 1267 n. 6 (11th Cir. 2001)(ADEA); Chapman v. AI Transport, 229 F.3d 1012, 1024 (11th Cir. 2000)(ADEA). The plaintiff must first make out a *prima facie* case of discrimination. Burdine, 450 U.S. at 252-53; Walker v. Mortham, 158 F.3d 1177, 1183 (11th Cir.1998); Combs, 106 F.3d at 1527-

---

[4] McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973); Texas Department of Community Affairs v. Burdine, 450 U.S. 248 (1981).

28.  "Establishment of the *prima facie* case in effect creates a presumption that the employer unlawfully discriminated against the employee.  If the trier of fact believes the plaintiff's evidence, and if the employer is silent in the face of the presumption, the court must enter judgment for the plaintiff because no issue of fact remains in the case." Id. (quoting Burdine, 450 U.S. at 254); Walker, *supra*.

If the plaintiff establishes a *prima facie* case, the employer has the burden of producing "legitimate, non-discriminatory reasons for the challenged employment action." Combs, 106 F.3d at 1528 (citing McDonnell Douglas, 411 U.S. at 802).  "To satisfy this intermediate burden, the employer need only produce admissible evidence which would allow the trier of fact rationally to conclude that the employment decision had not been motivated by discriminatory animus." Combs, 106 F.3d at 1528 (quoting Burdine, 450 U.S. at 257).  If the employer articulates a legitimate, nondiscriminatory reason for its decision, the mandatory inference of discrimination arising from the *prima facie* case is destroyed. Walker, 158 F.3d at 1184. The plaintiff must then produce evidence "including the previously produced evidence establishing the *prima facie* case, sufficient to permit a reasonable factfinder to conclude that the reasons given by the employer were not the real reasons for the adverse employment decision." Combs, 106 F.3d at 1528.

<u>Discriminatory Discipline/Termination Claim</u>

In its brief, defendant appears to contend that plaintiff's claim relates solely to his termination.  However, plaintiff alleged in his complaint that defendant also discriminated against him with respect to discipline.  (Complaint, ¶ 9).  Plaintiff's claim of discriminatory

9

termination is dependent on his contention that the disciplinary measures leading to his termination – the two two-step major offense reprimands – were administered to him because of his race and age. He does not contend that other employees who incurred two major offense reprimands within a six month period were not terminated but, rather, that he received major offense reprimands while other employees engaging in similar conduct did not. Thus, if plaintiff establishes that his major offense reprimand was discriminatory, he prevails also on his termination claim. See Knight v. Baptist Hospital of Miami, Inc., 330 F.3d 1313, 1316 n. 4 (11th Cir. 2003)("Knight can establish a *prima facie* case based on her termination, however, if the decision to give her a decision-making day was discriminatory: the termination, which arose out of the decision-making day, would be improper as well.").

Defendant argues that it is entitled to summary judgment because there is no evidence that a similarly situated white or younger employee was treated more favorably than plaintiff. (Defendant's brief, pp. 11-16). The parties agree that plaintiff must present such evidence to establish a *prima facie* case of discrimination. (See Plaintiff's brief, p. 15; Defendant's brief, p. 12)(citing Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003) and Holifield v. Reno, 115 F.3d 1555, 1561-62 (11th Cir. 1997), respectively).[5] Defendant

---

[5] In the court's view, it is questionable whether defendant's motion directly put plaintiff's ability to establish a *prima facie* case into issue, although defendant did argue – in a footnote – that it was "not clear" that plaintiff could do so. (Defendant's brief, p. 12 n. 4). However, plaintiff directs most of his responsive argument to this issue, apparently interpreting defendant's argument to include a contention that he cannot establish a *prima facie* case. (Plaintiff's brief, pp. 15-19). Accordingly, the court does likewise. Evidence of a similarly situated comparator who was treated more favorably could serve both to establish an element of the *prima facie* case of discriminatory discipline and to establish pretext. However, resolving the issue in defendant's favor at the first stage of the burden-shifting analysis renders consideration of the remaining stages of the McDonnell

argues that the three comparators identified by plaintiff during his deposition (Steven Cummings, Donna Polson and Linda Gravette) are not situated similarly to plaintiff.

Plaintiff maintains that the evidence of record regarding Cummings, Polson and Gravette is sufficient to establish both his *prima facie* case and pretext and, further, that the subjectivity of the disciplinary policy – which gives a supervisor discretion to determine whether to administer discipline and whether an offense is major or minor – "lends itself to a finding of discrimination." (Plaintiff's brief, p. 20).

> "In determining whether employees are similarly situated for purposes of establishing a *prima facie* case, it is necessary to consider whether the employees are involved in or accused of the same or similar conduct and are disciplined in different ways." Holifield v. Reno, 115 F.3d 1555, 1562 (11th Cir.1997) (per curiam). "The most important factors in the disciplinary context ... are the nature of the offenses committed and the nature of the punishment imposed." Silvera v. Orange County School Bd., 244 F.3d 1253, 1259 (11th Cir.2001) (internal citation omitted). "In order to satisfy the similar offenses prong, the comparator's misconduct must be nearly identical to the plaintiff's in order to prevent courts from second guessing employers' reasonable decisions." Id. at 1259 (internal quotation and citations omitted). Employees are not "similarly situated" if management is aware of one's improper conduct, but not aware of the others' conduct. See Bogle v. Orange County Bd. of County Comm'rs, 162 F.3d 653, 658-59 (11th Cir.1998) (an employee who may have broken a rule but was not caught was not similarly situated to one who had been caught); see also Abel v. Dubberly, 210 F.3d 1334, 1339 (11th Cir.2000) (*per curiam*) (an employee who admitted to improper conduct was not similarly situated to one who did not). Summary judgment is appropriate if the plaintiff fails to show the existence of a similarly situated employee, and no other evidence of discrimination is present. Holifield, 115 F.3d at 1562.

Amos v. Tyson Foods, Inc., 153 Fed.Appx. 637, 647, 2005 WL 2847250, 9 (11th Cir. 2005).

As plaintiff argues, "'nearly identical' does not mean 'exactly identical.'" McCann v.

---

Douglas framework unnecessary.

11

Tillman, 526 F.3d 1370, 1374 n. 4 (11th Cir. 2008).  However, "[m]isconduct merely 'similar' to the misconduct of the disciplined plaintiff is insufficient." Rioux v. City of Atlanta, 520 F.3d 1269, 1280 (11th Cir. 2008)(citation omitted).

In addition to the Cotton Warehouse, where plaintiff worked, the Alexander City Distribution Center included another warehouse known as the "600 area."  It is similar in structure to the Cotton Warehouse but has no electronic guidance system and, accordingly, turret trucks are not used in the 600 area.  (Kretschmann aff., ¶ 9).  Polson and Cummings are white and younger than plaintiff.  Gravette is recently deceased; she was also white and younger than plaintiff.  (Oliver dec., ¶¶ 3-5; White depo., p. 121; Plaintiff's Exhibits 3, 7, 8; Kretschmann aff., ¶ 19).  All three employees worked in the 600 area operating "reach fork lifts."  Kretschmann was the manager responsible for the 600 area.  (Kretschmann aff. at ¶¶ 17-19; White depo., pp. 83-84).

Reach fork lifts and turret trucks are both used to retrieve pallets of goods from shelves up to fifty feet high.   A turret truck raises the operator so that the operator can see the pallet he or she is retrieving. Reach fork lift operators, in contrast, remain on the ground while using the fork lift to retrieve pallets and cannot see the exact place where the fork is being inserted.  Accordingly, they often "pop" or dislodge a shelf, or the grating lining a shelf – even when they are exercising reasonable care – while trying to retrieve a pallet. Because Kretschmann considers it to be an "unavoidable occurrence," he does not discipline employees for "popping" shelves or grating from the racks.  (Kretschmann aff., ¶ 10).

*Donna Polson*

Donna Polson undisputedly had an accident on March 15, 2007 similar to plaintiff's first accident; while operating her reach fork, she bumped into another reach fork, causing back pain to the other operator. For this accident, Polson – like the plaintiff – received a major offense reprimand. (Polson dec., ¶ 2; Plaintiff's Exhibit 4, Polson's corrective action form). Plaintiff has presented evidence that, shortly after the March 15, 2007 incident, Polson "hit a rack in the distribution center with the piece of equipment she was operating." (Oliver dec., ¶ 3; Riggins dec., ¶ 3). Polson declares that she has occasionally popped out a horizontal shelf with her reach fork, but that she has not otherwise struck any racks either with a reach fork or a turret truck. (Polson dec., ¶ 3).[6] Plaintiff concedes that the incident involved shelf-popping but, citing the declaration of Marilyn Oliver, argues that "[p]opping the rack out caused a very dangerous situation because the shelf was loaded with goods which were in a very precarious position." (Plaintiff's brief, p. 7).[7] Plaintiff notes that Polson "was not given any type of disciplinary action because of this second incident of knocking the shelf off of the rack." (Id.).

As noted previously, plaintiff received his second major reprimand after he backed his turret truck into a rack. Polson, using a reach fork, popped a horizontal shelf from a rack. Kretschmann testified that shelf-popping by a reach fork operator is "unavoidable" and not

---

[6] In its brief, defendant argues that plaintiff's testimony that Polson "struck a rack" (White depo., pp. 97-99) is hearsay. (Defendant's brief, p. 15). Plaintiff does not respond to this argument and does not rely on his own deposition testimony on this point in opposing the motion.

[7] Oliver stated, "I saw that Ms. Polson had taken out a rack, which caused a very dangerous situation since the rack was filled with goods." (Oliver dec., ¶ 3).

13

indicative of an operator's failure to exercise reasonable care and, accordingly, that he does not discipline reach fork operators for popping shelves or gratings. (Kretschmann aff., ¶ 10). Plaintiff has not presented evidence showing that Polson's second incident is "nearly identical" to plaintiff's and, accordingly, has not established a *prima facie* case of discriminatory discipline or termination by pointing to Polson as a comparator.

Additionally, plaintiff has failed to identify competent evidence of record permitting a reasonable inference that Kretschmann, the decisionmaker, was aware of Polson's second incident. Oliver declares that she "observed that Robert Horton and George Kretschmann were aware of the incident[,]" and that Polson "was removed from driving this equipment for a period of time after this second incident." (Oliver dec., ¶ 3). This testimony presents Oliver's conclusions about what happened without providing the underlying facts. It is not possible that Oliver "observed" anybody's awareness. Oliver does not explain what led her to conclude that Horton and Kretschmann were aware of the incident; her declaration includes no supporting facts which would permit an inference of such awareness. Sidney Riggins declares that he "observed that management, including, Robert Horton, was aware of the incident," also without providing supporting facts. (Riggins dec., ¶ 3).

To be considered on summary judgment, an affidavit or declaration "must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant [or declarant] is competent to testify on the matters stated." Fed. R. Civ. P. 56(e). To defeat a properly made and supported motion for summary judgment, the opposing party "must – by affidavits or as otherwise provided in [Rule 56] – set out specific facts showing

14

a genuine issue for trial." Fed. R. Civ. P. 56(e)(2). The Eleventh Circuit has "'consistently held that conclusory allegations without specific supporting facts have no probative value.'" Leigh v. Warner Bros., Inc., 212 F.3d 1210, 1217 (11th Cir. 2000)(quoting Evers v. General Motors Corp., 770 F.2d 984, 985 (11th Cir. 1985)); see also Miller v. Citizens Security Group, Inc., 116 F.3d 343, 346 (8th Cir. 1997)("A conclusory statement in an affidavit, however, cannot create a genuine issue of material fact which precludes summary judgment."). Plaintiff's witnesses' testimony that Kretschmann and Horton were aware of the incident, and that Polson "was removed" from the equipment do not provide specific facts permitting a reasonable inference that either Horton (assuming that he was Polson's supervisor) or Kretschmann were aware of the incident. Thus, even if Polson's shelf-popping incident were sufficiently similar to plaintiff's second accident, plaintiff has failed to demonstrate knowledge on the part of Horton and/or Kretschmann and, accordingly, has not shown that he is "similarly situated" to Polson. See Knight, 330 F.3d at 1317 n. 5 ("[U]nless [the decision-making supervisors] knew of the events [involving the comparator], the events cannot be considered in determining whether [plaintiff] and [the comparator] are similarly situated. . . . 'Discrimination is about actual knowledge, and real intent, not constructive knowledge and assumed intent.'")(citations omitted).

*Linda Gravette*

Riggins testifies that he has "personal knowledge that another white female employee, Linda Gravette, hit racks with her equipment on multiple occasions[,]" and that he "observed that Ms. Gravette damaged the rack and that maintenance was called to repair the rack."

15

(Riggins dec., ¶ 4).  Oliver states:

> I also have personal knowledge that another white female employee, Linda Gravette, hit racks with her equipment on at least 4 different occasions.  I saw that Ms. Gravette took out a rack and personally observed Ms. Gravette being sent to take a drug test on at least 1 occasion.  If Ms. Gravette was sent for a drug test, then someone in management would have known about the incident.

(Oliver dec., ¶ 4).  These statements are insufficient to demonstrate that either Riggins or Oliver witnessed Gravette hit a rack on more than one occasion.  Neither witness explains how he or she came to have "personal knowledge" that Gravette hit racks on multiple occasions. Even if Gravette did so, however, plaintiff's evidence is not sufficient to show that Gravette's incidents were anything other than the shelf-popping which Kretschmann has determined is "unavoidable" and not indicative of a lack of reasonable care on the part of the operator.[8]  Thus, plaintiff has failed to show that Gravette's conduct was "nearly identical" to his.  Additionally, as with Polson, plaintiff has failed to demonstrate that Horton and/or Kretschmann were aware of the Gravette incident(s).  Riggins' testimony that "maintenance was called to repair the rack" (Riggins dec., ¶ 4) and Oliver's statement that "someone in management would have known about the incident" because Gravette was sent for a drug test does not permit a reasonable inference that Horton and/or Kretschmann personally knew of the incident(s). Accordingly, even if Gravette's actions were sufficiently similar to plaintiff's, she is not an adequate comparator for purposes of establishing plaintiff's *prima facie* case.

---

[8] Plaintiff argues that Gravette "hit racks with her equipment on multiple occasions and also popped out shelves from the racks."  (Plaintiff's brief, pp. 7-8). Polson testified that Gravette "occasionally popped shelves out with the reach fork" and "was sent for a drug test."  (Polson dec., ¶ 5).  Oliver's and Riggins' testimony is imprecise and does not provide any detail regarding how, exactly, Gravette "hit" the racks.

*Steven Cummings*

Plaintiff relies on his own deposition testimony, in which he stated that other employees and Steve Cummings told plaintiff that Cummings had hit a rack the day before plaintiff's second accident, to prove that Cummings "hit a rack." (Plaintiff's brief, p. 8 (citing White depo., pp. 82-83)). Defendant objects to this testimony, noting that hearsay is inadmissible on summary judgment. The court agrees that the cited evidence – plaintiff's testimony about what other employees, including Cummings, told him – is not competent evidence that Cummings hit a rack. See Macuba v. Deboer, 193 F.3d 1316, 1322-25 (11th Cir. 1999)(district court erred by considering, on summary judgment, witness' statement about statements made to him which were offered for their truth). Oliver states, "I have observed that a white employee, Steve Cummin[g]s, took out a bottom rack with his equipment. I know that the safety officer was called to investigate the incident[.]" (Oliver dec., ¶ 5). Cummings admits to causing the grate on a shelf to fall, but denies striking a rack. (Cummings dec., ¶ 2).

It is not apparent to the court, from the evidence cited by plaintiff, that taking out a rack is "nearly identical" to plaintiff's action in backing his turret truck into a rack. Even assuming that Cummings "took out a bottom rack," that this was a separate event from causing a grate to fall, and that his conduct was sufficiently similar to plaintiff's, Cummings is not an adequate comparator because plaintiff has failed to demonstrate that Kretschmann[9]

---

[9] Plaintiff argues that " . . . White and Cummings worked in the same department under one manager – Robert Horton." (Plaintiff's brief, p. 8 (citing White depo. at p. 84)). While this statement may be true, this was not plaintiff's testimony. A careful review of the evidence cited by

knew of the incident. Kretschmann states that the only violation of safety practices by Cummings known to Kretschmann was Cummings' failure to use a tether while operating a forklift in July 2000, and that he is not aware of any other accidents Cummings has had. (Kretschmann aff., ¶ 17). Kretschmann further indicates that, during his meeting with plaintiff regarding the second reprimand, plaintiff questioned why plaintiff was receiving a major reprimand when Cummings had hit a rack on July 11 or July 12. Kretschmann testified that he and Horton investigated plaintiff's claim and "found no damage to any racks in Cummings' area and no evidence that Cummings had violated any safety practices." (Id., ¶ 15). Oliver states that the safety officer was called; Cummings states that he called maintenance. (Cummings dec., ¶ 2; Oliver dec., ¶ 5). Plaintiff fails to provide any evidence that Kretschmann is routinely notified of incidents requiring maintenance or involvement of the safety officer, and provides no other evidence permitting an inference that Kretschmann was aware of an instance of Cummings striking a rack with a forklift. Without evidence that Kretschmann was aware of the incident involving Cummings – even if Cummings did hit and damage a rack – plaintiff cannot demonstrate that he and Cummings are "similarly situated."[10]

---

plaintiff – page 84 of his deposition – reveals that plaintiff actually testified that Horton was *plaintiff's* immediate supervisor and that plaintiff and Cummings both worked under the same manager, Kretschmann. Plaintiff said nothing about whether Horton was also Cummings' supervisor. Thus, on the evidence before the court, Horton's knowledge is not relevant. Even if it were, however, plaintiff points to no evidence that Horton was aware of Cummings' striking a rack.

[10] The fact that the disciplinary policy allows supervisors some measure of discretion is not sufficient – without other evidence permitting an inference that Kretschmann exercised that discretion in a discriminatory manner – to establish plaintiff's *prima facie* case of discriminatory

Case 3:08-cv-00401-SRW   Document 30   Filed 12/10/09   Page 19 of 19

## CONCLUSION

Because he has failed to identify a similarly situated comparator, plaintiff has failed to establish a *prima facie* case of discrimination with regard to his major offense reprimands and his subsequent termination. Accordingly, it is

ORDERED that defendant's motion for summary judgment is GRANTED. A separate judgment will be entered.

Done, this 10th day of December, 2009.

/s/ Susan Russ Walker
SUSAN RUSS WALKER
CHIEF UNITED STATES MAGISTRATE JUDGE

---

discipline.  See Jones v. Bessemer Carraway Medical Center, 137 F.3d 1306, 1311-12 (11th Cir.), *opinion modified in other respects by* 151 F.3d 1321 (11th Cir. 1998)(finding that plaintiff's comparators were not "similarly situated" for purposes of *prima facie* case, stating, "We have written that 'Title VII does not take away an employer's right to interpret its rules as it chooses, and to make determinations as it sees fit under those rules.'  Here, Defendant was entitled to conclude that taking a day off after a request for the day off is denied is not insubordination under its rules, but instead, is an attendance violation. Nothing is wrong with this practice as long as the practice is followed in a nondiscriminatory manner (and no evidence shows discriminatory application – whites and blacks treated differently – of the practice).")(citation omitted).